**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KELLY REINHART,**

                        **Plaintiff,**

                                                        **1:05-CV-630 (Lead)**
                **v.**                                   **1:04-CV-317 (Member)**
                                                        **(GLS/DRH)**

**CITY OF SCHENECTADY POLICE**
**DEPARTMENT, CITY OF SCHENECTADY,**
**DIANE UPDYKE,[1] and ROBERT**
**GLASSER,**

                        **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE PLAINTIFF:**

OFFICE OF KEITH F. SCHOCKMEL     KEITH F. SCHOCKMEL, ESQ.
4 Atrium Drive
Suite 290, Executive Woods
Albany, New York 12205

**FOR THE DEFENDANTS:**

CARTER, CONBOY LAW FIRM          MICHAEL J. MURPHY, ESQ.
20 Corporate Woods Boulevard
Albany, New York 12211

**Gary L. Sharpe**
**U.S. District Judge**
_____

        [1]Updyke was sued under a fictitious first name and Reinhart has not moved to amend her complaint.  The court has *sua sponte* substituted her correct name, and directs the Clerk to amend the docket.  (*See* Updyke Dep., Att. 30, Ex. P. ("Updyke Dep."), Dkt. No. 57.)

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Kelly Reinhart ("Reinhart") filed this consolidated civil rights action

alleging that Schenectady Police Detective Robert Glasser ("Glasser") and

jail matron Diane Updyke ("Updyke") violated her Fourth Amendment rights

by, respectively, causing her arrest and prosecution, and by seizing her

brassiere.[2]  (*See* Compl., Dkt. No. 1; *see also* 42 U.S.C. § 1983.)  She also

alleges companion state claims based on her Fourth Amendment theories,

and a state claim for negligent infliction of emotional distress.  Lastly, she

alleges *Monell*[3] claims against the City of Schenectady.[4]

_____

[2]Reinhart filed two separate actions based on the same facts.  (*See* Dkt. Nos. 1; Case Nos. 1:04-cv-317, 1:05-cv-630.)  After the defendants moved to dismiss the second action, the court denied the motion, consolidated the cases, designated the second as the lead, and directed that all future docketing occur in the lead case.  (*See* Dkt. Nos. 3, 35; 1:05-cv-630.)

Reinhart also alleges due process violations in contravention of the Fifth and Fourteenth Amendments, but her complaint focuses on Fourth Amendment conduct.  The Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of REHNQUIST, C.J.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

[3]Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

[4]Although Reinhart also sued the Schenectady Police Department, the proper defendant is the City.  Under New York law, a city is a municipal corporation capable of bringing suit and being sued.  *See* N.Y.GEN.MUN.LAW § 2 (McKinney 1986).  "A police department is an administrative arm of the municipal corporation." *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y.1999) (citation omitted).  As such, "[a] police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have

Both parties have cross-moved for summary judgment.  (*See* Dkt. Nos. 57, 64; *see also* FED. R. CIV. P. 56.)  For the reasons that follow, Reinhart's motion is denied, the defendants' motion is granted, and these consolidated actions are dismissed in their entirety.

## II.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (citation omitted).  When evaluating the material facts, the court must "construe the evidence in the light most favorable to the non-moving party."  *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir. 1999)*.*  Thus, the movant must demonstrate the absence of genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999), a burden it can meet "if [it] can point to an absence of evidence to support an essential element of the nonmoving party's claim."

its own legal identity."  *Id*.

3

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

If the movant satisfies its burden, the nonmoving party must offer specific evidence showing that a genuine issue of material fact warrants a trial. *See Celotex*, 477 U.S. at 324. "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted). A genuine dispute does not arise simply from the allegations or denials in the pleadings. Instead, material disputes must be based on specific facts as reflected in the adverse party's response, by affidavits or as otherwise authorized by Rule 56, *see St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000), and affidavits must be based on personal knowledge. *See Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir. 1993). The bald assertion of some alleged factual dispute will not defeat a properly supported motion. *See Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Naturally, reasonable inferences may

4

defeat a summary judgment motion, but only when they are supported by affirmative facts and relevant, admissible evidence.  *See Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 515 (S.D.N.Y. 1997) (citing Fed.R.Civ.P. 56(e)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248. From the court's perspective, the parties have expended considerable energy debating facts and circumstantial conclusions that are irrelevant to the material issues.

### III.  **Facts**[5]

On April 12, 2002, Rose Melanson ("Melanson") personally appeared at the Schenectady Police Department and first told an intake officer and later Detective Glasser that she had received threatening and harassing telephone calls.  (*See* Att. 3, Ex. A ("April 12 Report"), Dkt. No. 57.)  On May 8, she filed a second face-to-face report, and conveyed new instances of threatening calls directed at her grandchildren.  (*See* Att. 3, Ex. B ("May 8 Report"), Dkt. No. 57.)  Reinhart does not dispute that the substance of the calls provided the factual basis for an Information eventually filed in the

---

[5]For the most part, the cogent facts are self-evident in the underlying record.

Schenectady City Court, and that those facts provided a reasonable basis to believe that the caller committed the crime of Aggravated Harassment. *See* N.Y. PENAL LAW § 240.30(1) (McKinney 2008). Thus, probable cause to believe that someone committed the crime is conceded.

As to the identity of the culprit, Melanson told the intake officer on April 12 that the caller was a female, and identified herself as "Kelly." (*See* April 12 Report.) Melanson was then referred to Detective Glasser who reviewed the report and told her that there was insufficient information to obtain an arrest warrant. (*See* Def.'s. SMF ¶ 7-8; Dkt. No. 57.)

When Melanson personally appeared a second time on May 8, she reported the new instances of threatening calls, identified the caller's last name as "Reinhart," and opined that her landlord was behind the calls. (*See* May 8 Report.) Once again, she was referred to Glasser. (*See* Def.'s. SMF ¶ 11; Dkt. No. 57.)

Glasser prepared an Information charging Reinhart with Aggravated Harassment. (*See* Att. 5, Ex. C ("Information"), Dkt. No. 57.) Glasser did not sign the Information. Instead, Melanson signed it as the complainant and attested to the truth of the Information's factual allegations under the penalty of perjury. (*See* Information; *see also* Def.'s. SMF ¶ 15, Dkt. No.

6

57.)  Glasser then forwarded the Information, the police reports and a request for a warrant to Schenectady City Court Judge Karen Drago for her review.  (*See* Def.'s. SMF ¶ 18, Dkt. No. 57.)

On May 10, 2002 a criminal action was commenced against Reinhart when Judge Drago filed Melanson's Information.  (See Att. 6, Ex. D ("Arrest Warrant"), Dkt. No. 57; Def.'s SMF ¶ 19, Dkt. No. 57.)  Finding the Information facially sufficient, Judge Drago issued an arrest warrant for Reinhart.  (*See* Arrest Warrant; Def.'s. SMF ¶ 19, Dkt. No. 57.)

On May 23, Reinhart was arrested at the police station pursuant to Judge Drago's warrant.  (*See* Def.'s. SMF ¶ 20, Dkt. No. 57.)  She was then processed and placed in a holding cell pending her arraignment.  After she entered the holding cell, jail matron Updyke directed her to remove her brassiere, and Reinhart complied.  (*See* Att. 9, Ex. G, Dkt. No. 57; Def.'s. SMF ¶ 25, Dkt. No. 57; Pl.'s SMF ¶ 40, Dkt. No. 60.)

Updyke testified that the brassiere was seized as a safety precaution, and Reinhart testified that she understood the purpose.  (*See* Updyke Dep. 26:2-4; Reinhart Dep. 54:1-3, Att. 28, Ex. N, Dkt. 57.)  Updyke also testified that while she did not specifically remember Reinhart, her usual practice was to permit women to slip the brassiere from under their clothes.

7

Moreover, she normally turned her back to afford additional privacy.  (*See* Updyke Dep. 26:23-27:2.)  For the safety of inmates and to prevent suicide, Schenectady Police Department policy requires all females to remove their brassieres when placed in a holding cell.  (*See* Def.'s. SMF ¶¶ 26-27, Dkt. No. 57.)

On February 1, 2003, Melanson died.  (*See* Att. 8, Ex. F, Dkt. No. 57; Def.'s. SMF ¶ 21, Dkt. No. 57.)  On March 10, the criminal charge against Reinhart was dismissed.  (*See* Def.'s. SMF ¶ 22, Dkt. No. 57.)

Reinhart argues that the following disputed facts– direct and circumstantial– are material to the pending motions: Melanson called police dispatch before her first visit, and identified the harassing caller as "Melanie" (*see* Schockmel Affirmation, Ex. H, Dkt. No. 61); Glasser prepared the Information - dated May 6 - and the warrant application two days before the second Melanson meeting (*see* Information; *see also* Def.'s. SMF ¶ 15, Dkt. No. 57 and Pl's RSMF ¶¶ 10, 15, 18, Dkt. No. 60); Glasser failed to examine Melanson and Reinhart telephone records to verify the source of the harassing calls (*see* Pl's Counter SMF ¶ 18-19, Dkt. No. 60); Glasser failed to compare the harassing caller's voice recorded on a Melanson audiotape with that of Reinhart (*see id.* at ¶¶ 15-17); Glasser

8

failed to retrieve records and information from the Telephone Annoyance

Bureau (*see id.* at ¶¶ 20-23); and Glasser failed to disclose this additional

information to Judge Drago (*see id.* at ¶¶ 26-31).

## IV. **Discussion**

### A. **False Arrest and Malicious Prosecution Claims**

Regardless of the nomenclature used by Reinhart in her complaint,

*see* Compl., ¶¶ 62, 66, 69, and 72, her actual claims are for false arrest

and malicious prosecution, and the elements of each are the same under

federal and New York law.[6]  *See Boyd v. City of New York*, 336 F.3d 72, 75

(2d Cir. 2003); *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).  The critical

element of each is the existence, or absence, of probable cause.  In other

words, if probable cause existed, the false arrest and malicious prosecution

claims must fail.[7]  *Boyd*, 336 F.3d at 75 (citing *Singer v. Fulton County*

*Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)); *see also Savino v. City of New*

*York*, 331 F.3d 63, 72 (2d Cir. 2003).

---

[6]Because Reinhart was arrested pursuant to Judge Drago's warrant, Reinhart's claim is one for false arrest not false imprisonment.  *See Wallace v. Kato*, 549 U.S. 384, 389 (2007).

[7]There are other elements of Reinhart's false arrest and malicious prosecution claims that require no analysis because the probable cause issue is determinative.  As to malicious prosecution, she must prove that a prosecution was initiated against her, it was brought with malice, and it terminated in her favor.  *See Boyd*, 336 F.3d at 76.  As to false arrest, she must prove that Glasser intended to confine her, that she was conscious of the confinement, and that she did not consent to it.  *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

An officer has probable cause to arrest if he has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted).  He has probable cause to commence an action if he has "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994).  The probable cause determination is an objective inquiry, and the standard is a "'practical, nontechnical conception'" that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted).  It "is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.  When assessing probable cause, facts must be viewed in their totality and should not be isolated or parsed.  *See United States v. Sokolow*, 490 U.S. 1, 8 (1989).  Ultimately, probable cause is based upon logical probabilities, not absolute certainty.  *See Boyd*, 336 F.3d at 76.

In this case, probable cause is measured at the time of arrest (false arrest), *see Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citation omitted), or at the time the criminal action commenced (malicious prosecution).  As to the source of information police officers may rely on, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."  *Panetta*, 460 F.3d at 396 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)).  Absent special circumstances suggesting distrust, a private citizen is presumed reliable, especially where she meets face-to-face with the police.  *See United States v. Elmore*, 482 F.3d 172, 180-81 (2d Cir. 2007) (citations omitted).

Once a police officer has probable cause, he need not explore every plausible claim of innocence before making an arrest.  *See Panetta*, 460 F.3d at 396 (citing *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)).  The fact that an innocent explanation may be consistent with the facts does not negate probable cause.  *See id.* (citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).  In fact, probable cause may be based on mistaken information, so long as the police acted reasonably and in good faith.  *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)

(mistaken identity of perpetrator).  An officer may not, however, ignore plainly exculpatory information.  *See Panetta*, 460 F.3d at 395.  Courts must be mindful that "'[o]nce police officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.  Their function is to apprehend those suspected of wrongdoing, and not finally determine guilt through a weighing of the evidence.'"  *Id.* at 396 (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)).  Accordingly, the eventual disposition of a criminal charge is irrelevant to the probable cause determination.  *See Pierson v. Ray*, 386 U.S. 547, 555 (1967).

Where officers are cooperating with one another in an investigation, there is a presumption that the knowledge of one is shared by all ("collective knowledge doctrine").  *See Illinois v. Andreas*, 463 U.S. 765, 771 n. 5 (1983); *Savino*, 331 F.3d at 74.  However, there is no independent duty mandating consultation, nor is there any independent duty requiring an officer to evaluate physical evidence before deciding to arrest or charge.  *See Walczyk v. Rio*, 496 F.3d 139, 160 (2d Cir. 2007); *Martinez*, 202 F.3d at 635.

When a judge evaluates a criminal complaint for legal sufficiency and

then issues an arrest warrant, there is a presumption that it is objectively

reasonable for police officers executing the warrant to believe that probable

cause to arrest exists.  *See Golino v. City of New Haven,* 950 F.2d 864,

870 (2d Cir. 1991) (citations omitted).  One arguing that the warrant was

issued on less than probable cause faces a heavy burden.  *See id.*  In

order to shoulder that burden, she must establish that the officer who

applied for the warrant knowingly and intentionally, or with reckless

disregard for the truth, made a false statement in her application, and that

the false statement was necessary to the probable cause finding.  *See id.*

Intentional or reckless omissions of material information may suffice, and

recklessness may be inferred where omitted information is critical to the

probable cause determination.  *See id.* at 871.  As to whether affirmative

statements or deliberate omissions are critical to the probable cause

determination, the Second Circuit has adopted the "corrected affidavit

doctrine" which looks to a corrected affidavit to determine the remaining

sufficiency of probable cause.  *See Escalera v. Lunn*, 361 F.3d 737, 743-44

(2d Cir. 2004).  However, an officer's failure to report a fact to the judge

that arguably cuts against probable cause is not a material failure to

disclose as long as that fact is not critical to the probable cause

13

determination.  *See Walczyk*, 496 F.3d at 161.

Probable cause and the reasonableness of Glasser's conduct must also be evaluated in the context of New York's criminal procedures.  A criminal action is begun in a local court when, *inter alia*, an information is filed.  *See* N.Y. CRIM. PROC. LAW §§ 100.05, 100.10(1) (McKinney 2004). An information is a verified written accusation by a person charging another with a crime, and it serves as the basis for prosecution of that person.  *Id.* at §§ 100.10(1), 1.20(4) (defining Information).  Read in conjunction with one another, two different sections define the sufficiency of an information - one related to form and content and the other to probable cause.  *See id*. §§ 100.15, 100.40.  As relevant here, those sections provide that: an information must be subscribed and verified by a person known as the complainant; the complainant can be a person with personal knowledge of the offense; the complainant's verification of the information applies to the factual allegations contained therein; and, in order to meet the legal requirement of facial sufficiency, the information must recite the elements of the offense, identify the defendant, and be supported by non-hearsay allegations.  *See id.* § 100.15 (1-3).  So too, an information is sufficient on its face if "[t]he allegations of the factual part ... provide reasonable cause

to believe that the defendant committed the offense." *Id*. § 100.40(1)(b).
The complainant's verification is legally sufficient if the information contains
a form notice related to false statements and perjury. *Id*. § 100.30(1)(d).

Once the information is filed and the criminal action commenced, the
judge may obtain jurisdiction over the defendant by issuing an arrest
warrant. *See id*. § 110.10(1)(a).  However, before issuing a warrant, the
judge must satisfy herself that an information meets the legal requirements
of facial sufficiency. *See id*. §§ 120.10(1), 120.20(1)(a).  Otherwise, she
must dismiss the information. *See id*. § 120.20(1)(b).

With these principles in mind, the court turns to the probable cause
analysis, and begins by establishing the time parameters within which the
objective circumstances must be evaluated.  The malicious prosecution
claim first accrued when Judge Drago filed the Melanson Information on
May 10, thus commencing the criminal action.  The false arrest claim
accrued when Judge Drago's warrant was executed on May 23, and
Reinhart was arrested and deprived of her liberty.  Therefore, the question
is whether there was probable cause to commence the action on May 10,
and probable cause to arrest on May 23.  While the differing time intervals
might be meaningful in another case, here they are not because the factual

15

predicate for the probable cause determination did not materially change between the two intervals.  Again mindful that the sole issue is whether there was reason to believe that Reinhart committed the crime she concedes occurred, the court turns to that issue.

Whether or not Reinhart truthfully committed the crime may never be revealed - Melanson is dead, New York failed to prove Reinhart's guilt, and the charge has been dismissed.  While Reinhart's belief in her innocence may have precipitated her lawsuit, the issue is not the truth but whether it was reasonable for Glasser to believe that she was the culprit.  As to that issue, there is no material dispute ripe for trial because probable cause unquestionably existed.

Reinhart's opposition to the motion rests on a faulty factual foundation and cannot withstand scrutiny.  She begins with an immaterial disputed fact and through conjecture and surmise, she draws unwarranted circumstantial conclusions that do not create triable issues. Unquestionably, the Information subscribed and sworn to by Melanson is dated "May 6."  Glasser argues that the date is a mistake because the April 12 and May 8 Reports clearly establish that Melanson was at the station on May 8 when the Information was signed, not May 6.  Reinhart denies this

fact, arguing that the date on the Information speaks for itself.  Without any
evidentiary support whatsoever, she then concludes that Glasser somehow
manufactured her identity as the culprit on May 6th because Melanson did
not identify her as the caller until two days later on May 8th.  Although such
conjecture hardly suffices as an evidentiary basis sufficient to deny a
summary judgment motion, the date is meaningless in any event.  The
question is whether there was probable cause to believe Reinhart was the
culprit when the criminal action was commenced on May 10, and the date
upon which Melanson signed the Information is irrelevant to that inquiry.
Instead, the only fact documented in the record is that Melanson swore in
the Information that Reinhart was the culprit.  Reinhart points to nothing
that controverts that fact.

     As to the reasonableness of Glasser's conduct and his reliance on
Melanson, the court turns to an objective evaluation of all circumstances
extant on and before May 10.  On April 12, he met face-to-face with
Melanson, a citizen and crime victim.  Reinhart has identified nothing in the
record known to Glasser that would lead the court to objectively conclude
that Glasser should have distrusted what Melanson said.  Accordingly,
Glasser rightly presumed that Melanson was reliable.  At their first meeting,

Melanson told Glasser that the culprit was a female who identified herself as "Kelly."  Glasser then told Melanson that the facts were insufficient to support an information and arrest warrant.  Clearly, he did not believe the facts reasonably identified the culprit.

On May 8, Glasser again met with Melanson face-to-face.  Nothing in the record reasonably supports the conclusion that the reliable citizen presumption had dissipated.  Whether on May 6, May 8 or any other date before May 10, the undisputed factual record, including the facts delineated in the incontrovertible May 8 Report, reflects that Melanson supplied Glasser with "Reinhart" as Kelly's last name.  Armed with Reinhart's identity, Glasser still declined to personally act.[8]  Instead, he prepared the Information, and Melanson, as the complainant, swore that Reinhart committed the crime.  Glasser then forwarded the Information, a warrant application and the police reports to Judge Drago so that she could

---

[8]The court does not suggest that simply because Melanson swore to the accuracy of the Information, Glasser is, *a fortiori*, absolved of any responsibility.  42 U.S.C. § 1983 provides a private right of action against any person who, acting under color of state law, causes another to deprive a person of her constitutional rights, *see Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir. 1999), and personal involvement in an alleged constitutional deprivation is a prerequisite to liability.  *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (citation omitted).  Thus, if Glasser caused Melanson to file an Information which he knew contained material falsehoods or omissions relevant to probable cause, liability might attach.  Of course, Reinhart has failed to identify any facts in the underlying record that would support such a conclusion.

exercise her judgment as legally she was required to do.  On May 10, Judge Drago commenced the criminal action when she filed the Information, which legally meant that she reviewed the document and believed it established probable cause- both as to crime and perpetrator. Detective Glasser had every right to rely on her determination in that regard.  Between May 10 and Reinhart's arrest on May 23, the undisputed facts supporting probable cause to believe Reinhart was the culprit did not change.

As recited earlier, Reinhart argues a litany of facts she claims are disputed and material to the probable cause determination.  *See* Facts, *supra* at 8-9.  As already discussed, her argument concerning the actual date upon which Glasser prepared the Melanson Information is immaterial because that dispute does not create a triable issue as to whether probable cause existed on May 10 when Judge Drago filed the Information.  Other than raw speculation concerning a *sub rosa* conspiracy orchestrated by Glasser to target Reinhart as the culprit, there is not a scintilla of evidence in the actual record demonstrating that her identity emanated from any source other than Melanson.

As to other so-called disputed facts, the court must identify their

source in order to evaluate their significance.  Indisputably, the Melanson

dispatch call that preceded her first face-to-face meeting with Glasser

occurred on the same day, and identified the harassing caller as "Melanie."

(See Pl's Counter SMF ¶¶ 1-2, Dkt. No. 60; Schockmel Affirmation, Ex. H,

Dkt. No. 61.)  However, Reinhart identifies nothing in the record supporting

a reasonable conclusion that Glasser knew about the call, that he relied on

any report from a fellow officer regarding the call, or that as a matter of

routine procedure he would retrieve and review such a call, especially

since the call only served to schedule a face-to-face station visit.  In fact,

the record indisputably demonstrates that Melanson's original call resulted

in a face-to-face meeting first with a desk officer who prepared the April 12

Report that Glasser then reviewed during his Melanson interview.

Reinhart argues that Glasser should have examined Melanson and

Reinhart telephone records to verify the source of the harassing calls.

(See Pl's SMF ¶¶ 18-19, Dkt. No. 60 (citing Att. 29, Ex. O ("Glasser Dep."),

Dkt. No. 57.))  Glasser testified during his deposition that he did not.

Reinhart cites nothing in the record, however, that supports her

argumentative conclusions that such records existed, or that such records

would identify the culprit.

Reinhart argues that Glasser failed to compare the harassing caller's voice recorded on a Melanson audiotape with that of Reinhart. (S*ee* Pl's SMF ¶¶ 15-17, Dkt. No. 60 (citing Schockmel Affirmation, Ex. H, p. 6-7, Dkt. No. 61.))  The dispatch logs provide factual support demonstrating that Melanson called the station on May 8, that she told the officer that she had an audiotape of the culprit, and that he instructed her  to bring the tape to the station.  Reinhart cites no record support demonstrating that Melanson complied, that Glasser ever knew she had an audiotape, that he ever listened to an audiotape, or that he had any voice exemplar of Reinhart that he could have compared to such a tape.

Reinhart argues that Glasser failed to retrieve records and information from the Telephone Annoyance Bureau.  (*See* Pl's SMF ¶¶ 20-23, Dkt. No. 60 (citing Schockmel Affirmation, Ex. H, p. 1-a, Dkt. No. 61.)) There is factual support in the dispatch records that a dispatch officer notified the Annoyance Bureau that Melanson had received harassing calls, but Reinhart cites nothing in the record reflecting that Glasser knew about the referral, nor does she cite anything in the record indicating that the Bureau had any records whatsoever.

These "disputed facts" have no bearing on an objective analysis of

probable cause.  The determination must be made on the basis of what

Glasser knew, not what he might have learned had he conducted some

further investigation that he was not required to conduct in the first place.

He had no duty to consult with dispatch and even if other evidence existed

- a claim by no means documented in the record - there is no basis to

conclude that Glasser was aware of it.  Furthermore, he had no legal duty

to evaluate any physical evidence, much less conduct a further

investigation.  Consequently, there was nothing deliberately or recklessly

withheld from Judge Drago when she determined on May 10 that

Melanson's sworn identification of Reinhart as the culprit was supported by

probable cause.  Thus, in addition to Melanson's sworn statement that

Reinhart committed the crime, Glasser was entitled to rely on the fact that

Judge Drago filed the Information and issued the warrant.

Objectively, there was probable cause to commence the criminal

action on the basis of Melanson's sworn Information alone, and arrest

Reinhart on the basis of Judge Drago's warrant.  Accordingly, the claims

for false arrest and malicious prosecution must be dismissed.

### B.  The Brassiere and the Fourth Amendment Claim

While a plaintiff is certainly the master of her complaint, the court

believes that Reinhart has mischaracterized her Fourth Amendment claim

as one asserting an illegal strip search in violation of *Weber v. Dell*, 804

F.2d 796 (2d Cir. 1986).  (*See* Pl's MOL at pp. 12-13, Dkt. 62.)  As the

Second Circuit has explained:

> The word "search" carries a common meaning to the average
> person.  Dictionary definitions furnish some guide: "to go over
> or look through for the purpose of finding something; explore;
> rummage; examine," "to examine closely and carefully; test and
> try; probe," "to find out or uncover by investigation." Webster's New World Dict
> Dictionary (2d ed. 1989) is not much different: "examination or scrutiny for
> the purpose of finding a person or thing," "look through, examine internally
> (a building, an apartment, a receptacle of any kind) in quest of some object
> concealed or lost." *Id.* at 804, 805. Thus, under either the King's or the
> Colonists' English, the term "search" implies something more than a
> superficial, external examination. It entails "looking through," "rummaging,"
> "probing," "scrutiny," and "examining internally."

*United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995).  Clearly, Reinhart's

removal of her brassiere at Updyke's direction fails to satisfy this common

understanding of the word "search."  On the other hand, a "seizure"

requires police action that meaningfully interferes with a possessory

interest, s*ee Arizona v. Hicks*, 480 U.S. 321, 324 (1987), or "deprives the

individual of dominion and control over his or her person or property."

*United States v. Horton*, 496 U.S. 128, 133 (1990) (citation omitted).  Thus

the challenged conduct here amounted to a seizure, not a search.

Nonetheless, Reinhart had an expectation of privacy in both her upper body and her clothing sufficient to invoke Fourth Amendment protection against an unreasonable police invasion accomplished through a seizure. *See United States v. Amerson*, 483 F.3d 73, 85 n.12 (2d Cir. 2007).

A seizure is ordinarily unreasonable absent a suspicion of wrongdoing. *See id.* at 78 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). However, there are a variety of suspicionless-search programs that have survived constitutional scrutiny under one of two tests - either the "special needs" test, or a balancing test based on the totality of the circumstances. *See id.* The Second Circuit favors the special needs test. *See id.* at 78-79. As Judge Calabresi explained, there is an unresolved question in light of recent Supreme Court precedent as to whether the special needs test has continued vitality as applied to prisoners. *See id.* at 79 n.5. Regardless, the Second Circuit's special needs test is more stringent than the balancing test and essentially incorporates the balancing test in any event. *See id.* at n.6. Accordingly, the court applies the special needs test, but observes that it would reach the same conclusion if it applied the balancing test.

The special needs test asks two questions. First, is the intrusion -

24

seizure in this case - justified by a special need beyond the ordinary need for normal law enforcement?  Second, if the answer is affirmative, was the seizure accomplished reasonably when the special need is balanced against the privacy interest upon which it intrudes.  *See id.*  As to the first question, a suspicionless-seizure will qualify as a special need if it "serve[s] as [its] immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation."  *Nicholas v. Goord,* 430 F.3d 652, 663 (2d Cir. 2005).  If the purpose of the special need has nothing to do with evidence gathering, "by definition, the concept of individualized suspicion has little role to play," in the analysis.  *Illinois v. Lidster*, 540 U.S. 419, 424 (2004).  As to the second question, the seizure must be accomplished reasonably in order to pass constitutional muster, and reasonableness is neither automatic nor presumed just because the need is special.  See *Amerson*, 483 F.3d at 83 & n.10.  Rather, reasonableness is determined by balancing three factors: "(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs."  *Cassidy v. Chertoff*, 471 F.3d 67, 75 (2d Cir. 2006).

When balancing under the second prong, the court must be mindful

that there is a direct correlation between the efficacy of the government's

special need and the corresponding intrusion that may be permitted.  Said

differently, if the need is attenuated, the invasion of privacy must be

minimal.  *See Amerson*, 483 F.3d at 84.  In that regard, those who are

incarcerated have a reduced expectation of privacy.  *See Samson v.*

*California*, 547 U.S. 843, 850 n.2 (2006).  Nonetheless, those charged with

misdemeanors who are in pretrial detention awaiting arraignment clearly

retain some degree of Fourth Amendment protection.  *See generally, N.G.*

*v. Connecticut*, 382 F.3d 225 (2d Cir. 2004); *Shain v. Ellison*, 273 F.3d 56

(2d Cir. 2001).  For instance, those charged with misdemeanors or lesser

offenses may not be strip-searched absent a reasonable suspicion to

believe they possess weapons or contraband.

*See Weber*, 804 F.2d at 802.

As to first special needs question, the court holds that the

Schenectady Police Department's policy of seizing the brassieres of all

women incarcerated in pretrial detention is supported by a rational purpose

that has nothing whatsoever to do with evidence gathering or any other

traditional law enforcement function.  Instead, brassieres are seized purely

as a safety measure to preclude their use as a suicide tool.  While the underlying record is not well developed, the court is cognizant of what it sees from its criminal docket on a daily basis.  There are various items of clothing commonly seized from pretrial detainees who might use those items to harm themselves.  Thus, belts, shoelaces and necklaces are commonly seized, and returned when a pretrial detainee is released.  A pretrial detainee could surely use her brassiere as a suicide tool, an observation supported by the Second Circuit's unpublished decision in *Washington v. The City of Binghamton*, 152 F.3d 922 (2d Cir. 1998). There, Shirley Harris-Smith, a pretrial detainee arrested for disorderly conduct - a violation under New York's law - "was found dead, hanging from the bars of her cell with a bra rapped (*sic*) around her neck."  *See id.*

As for balancing the character and degree of the governmental intrusion against the suicide prevention policy, the policy was implemented in a manner reasonably designed to reduce the intrusion on Reinhart's privacy.  The only reason the policy causes pause whatsoever is the provocative notion that a female pretrial detainee is compelled to relinquish her brassiere, and might have to partially disrobe to do so.  In other words, the court sincerely doubts it will ever see a case where a pretrial detainee

argues that the seizure of her belt or shoelaces is a violation of her Fourth Amendment rights.  It is the sacrosanct nature of a woman's bosom that gives pause, and rightfully so.  That does not mean, however, that the policy loses its efficacy.  Instead, it means that those implementing that policy must accommodate the special concerns a female detainee would inevitably have.  The Schenectady Police Department's policy does so. Updyke testified that female jail matrons accomplish the seizure, and she usually allowed a woman to slip her brassiere right out from under her clothes.  She also testified that absent a suspicion that her safety was at risk, she routinely turned her back on women until they said they were finished.  Reinhart also testified that she removed her brassiere in a small room with only the matron present, and that she knew the brassiere was seized for safety precautions.

Since the record reflects that the suicide prevention policy had nothing to do with evidence gathering or any other law enforcement function, and since the policy was reasonably implemented to reduce the intrusion on Reinhart's expectation of privacy, there was no violation of her Fourth Amendment rights.

28

## C. __Qualified Immunity__[9]

Glasser and Updyke are entitled to qualified immunity if either (a) their actions did not violate clearly established law, or (b) it was objectively reasonable for them to believe that their actions did not violate such law. *See Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir. 2003) (citation omitted).  A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his or her conduct was unlawful.  *See id.* (citation omitted).  Even if the contours of a federal right and an officer's permissible actions were clearly delineated at the time of the acts complained of, a defendant may still enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate that right.  S*ee Robison* v. *Via*, 821 F.2d 913, 921 (2d Cir. 1987) (citation omitted).

As for the false arrest and malicious prosecution claims, the right to be free from arrest and prosecution without probable cause is well-

---

[9]The Supreme Court has recently revisited qualified immunity concluding that "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial." *Pearson v. Callahan, ---S.Ct----* ,2009 WL 128768, 9 (2009).  Here, the court will use the *Saucier* protocol.

established.  *See, e.g., Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007)

(arrest); *Cook*, 41 F.3d at 79 (malicious prosecution).  As with the

substantive analysis of both claims, the qualified immunity analysis hinges

on the probable cause inquiry.  The test is whether Glasser had arguable

probable cause because it was objectively reasonable for him to believe

that probable cause existed, and at the very least officers of reasonable

competence could disagree on whether probable cause existed.  *Gilles*,

511 F.3d at 246 (citing *Escalera*, 361 F.3d at 743).  The court has already

found that probable cause actually existed to commence a criminal action

and to arrest.  Accordingly, the lesser qualified immunity test is satisfied,

and Glasser is immune from suit.

As for the seizure of Reinhart's brassiere, Updyke is also entitled to

qualified immunity for various reasons.  In 2002, it was clearly established

that those arrested for misdemeanors and held in pretrial detention

maintained certain protections under the Fourth Amendment.  However,

that generalized observation does not control.  Instead, the question is

whether the law was clearly established in a more particularized sense.

Thus, the contours of the right must have been sufficiently clear that a

reasonable official would have understood that what she was doing

violated the law.  *See Kerman v. City of New York*, 261 F.3d 229, 236-37

(2d Cir. 2001).  The court has already held that Updyke's suspicionless

seizure of Reinhart's brassiere served a special need and was

accomplished reasonably under the Fourth Amendment.  Additionally, the

court has found no Second Circuit or Supreme Court precedent directly on

point.  Thus, even if Updke's conduct was unconstitutional, it was

objectively reasonable for her to believe that her actions were proper

because neither the Circuit nor the Supreme Court has ever held to the

contrary.  Therefore, even if the court is incorrect and the law does

preclude such a seizure, the law was not previously defined with

reasonable clarity.  Accordingly, Updke is entitled to qualified immunity.

### D.  The *Monell* Claims

Reinhart asserts that the City of Schenectady had policies permitting

arrest and prosecution without probable cause, and that the City failed to

train Glasser concerning probable cause and the necessity of presenting

exculpatory evidence to a judge.  (*See* Compl. ¶ 47.)  She also asserts that

the City's policy of seizing brassieres from female detainees is

unconstitutional.  (*See id.* at ¶ 52.)

A municipality may be held liable under § 1983 "when execution of a

government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts" a

constitutional injury.  *Monell,* 436 U.S. at 694.  A failure to train claim

cannot exist where no individual defendant has committed a constitutional

violation.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986);

*Amato v. City of Saratoga Springs*, 170 F.3d 311, 320 (2d Cir. 1999) ("if a

plaintiff fails to show that a constitutional violation occurred in the suit

against the individual officer, the corresponding cause of action against the

municipality will be mooted since a claim of negligent training is only

actionable where some constitutional violation actually occurred").  A

narrow exception exists if "the injuries complained of are not solely

attributable to the actions of named individual defendants."  *Barrett v.

Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999).

Thus, where a municipal body itself causes a constitutional injury through

conduct divorced from an individual defendant's action, municipal liability

may lie despite *Heller*.  *See id.*  However, where, as here, allegedly

injurious policies have manifested themselves only through the

constitutionally innocuous conduct of individual defendants there can be no

*Monell* liability.  *See Matican v. City of New York,* 524 F.3d 151, 154 (2d

Cir. 2008) (stating that "the City cannot be liable [for a failure to train] under § 1983, regardless of whether officers acted pursuant to a municipal policy or custom" unless the officers violated the plaintiff's constitutional rights); *Curley*, 268 F.3d at 71 (finding no municipal liability for a failure to train where individual officers had committed no constitutional violation).

Since the court has found that Reinhart's arrest and prosecution were supported by probable cause, her *Monell* policy and failure to train claims related to those theories must be dismissed.  Since the court has found that the brassiere seizure policy also passes constitutional muster, Reinhart's *Monell* policy claim must also be dismissed.

## E. Negligent Infliction of Emotional Distress

The defendants have argued that a state claim for negligent infliction of emotional distress cannot survive if the arrest and prosecution were supported by probable cause.  Reinhart failed to respond to the argument.

Indeed, "[a] lawful arrest cannot support a claim for intentional or negligent infliction of emotional distress."  *Csoka v. County of Suffolk*, 85 F. Supp. 2d 117, 123 (E.D.N.Y. 2000) (citing *Pawlicki v. City of Ithaca*, 993 F. Supp. 140, 145 (N.D.N.Y. 1998)).  Logically, the implementation of a constitutional seizure policy also cannot support such a claim.  Accordingly,

since there was probable cause to arrest and prosecute Reinhart and since the seizure policy was constitutional, her claim for negligent infliction of emotional distress is dismissed.

## V.  Conclusion

For the alternative reasons articulated in this opinion, it is hereby

**ORDERED** that the Clerk shall amend the docket to reflect the true first name of the defendant Updyke as "Diane;" and it is further

**ORDERED** that Reinhart's motion for summary judgment is denied (Dkt. No. 64); and it is further

**ORDERED** that defendants' motion for summary judgment is granted (Dkt. No. 57), and these consolidated actions are dismissed in their entirety; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties.

**IT IS SO ORDERED.**

February 10, 2009
Albany, New York

United States District Court Judge